RANDALL L. NELSON,

      **Plaintiff,**

   *vs.*

CAROLYN W. COLVIN, **Commissioner of Social Security,**

      **Defendant.**

CAUSE NO. 1:13-cv-1141-SEB-DKL

## REPORT AND RECOMMENDATION

Plaintiff Randall Nelson applied for a declaration of a period of disability, an award of disability-insurance benefits, and an award of supplemental-security-income disability benefits. The defendant Commissioner of Social Security finally denied his applications and he filed this action for judicial review. The district judge referred the matter to this magistrate judge for submission of a report and recommendation under 28 U.S.C. § 636. *Entry* [doc. 9]. For the reasons explained below, this magistrate judge recommends that the Commissioner's denial of benefits be affirmed.

### Standards

Judicial review of the Commissioner=s factual findings is deferential: courts must affirm if her findings are supported by substantial evidence in the record. 42 U.S.C. ▪ 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). If

the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner=s decision, then it is substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004). This limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ=s factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). *Carradine*, 360 F.3d at 758. While review of the Commissioner=s factual findings is deferential, review of her legal conclusions is *de novo*. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the Ainability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months@ 42 U.S.C. ' 1382c(a)(3)(A); 20 C.F.R. ' 905. A person will be determined to be disabled only if her impairments Aare of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy.@ 42 U.S.C. &
1382c(a)(3)(B). The combined effect of all of an applicant=s impairments shall be considered throughout the disability determination process. 42 U.S.C. & 423(a)(3)(G).

To be eligible for child insurance benefits, a claimant over the age of 18 must show that, at the time of filing his application, he was unmarried, he was dependent on an insured parent at the time of his or her death, and he was under a disability that began before the age of twenty-two and continued through the date of application. 42 U.S.C. & 402(d). In Mr. Davis=s case, that means that he must show that he was under a disability from at least May 12, 2005 (day before his twenty-second birthday) through May 8, 2009 (date of application). Mr. Davis alleges that he became disabled in August 2001.

The Social Security Administration (ASSA@) has implemented these statutory standards in part by prescribing a Afive-step sequential evaluation process@ for determining disability. If disability status can be determined at any step in the sequence, an application will not be reviewed further. At the first step, if the applicant is currently engaged in substantial gainful activity, then she is not disabled. At the second step, if the applicant=s impairments are not severe, then she is not disabled. A severe impairment is one that Asignificantly limits [a claimant=s] physical or mental ability to do basic work activities.@ Third, if the applicant=s impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, then the applicant is deemed

disabled. The Listing of Impairments are medical conditions defined by criteria that the SSA has pre-determined are disabling. 20 C.F.R. § 404.1525. If the applicant=s impairments do not satisfy a Listing, then her residual functional capacity (ARFC@) will be determined for the purposes of the next two steps. RFC is an applicant=s ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations and is categorized as sedentary, light, medium, or heavy. At the fourth step, if the applicant has the RFC to perform her past relevant work, then she is not disabled. Fifth, considering the applicant=s age, work experience, and education (which are not considered at step four), and her RFC, she will not be determined to be disabled if she can perform any other work that exists in significant numbers in the national economy. 42 U.S.C. § 416.920(a)

The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the Agrids@), may be used at step five to arrive at a disability determination. The grids are tables that correlate an applicant=s age, work experience, education, and RFC with predetermined findings of disabled or not-disabled. If an applicant has non-exertional limitations or exertional

limitations that limit the full range of employment opportunities at her assigned RFC level, then the grids may not be used to determine disability at that level; a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics. *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993). The grids result, however, may still be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist. If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts. If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1] An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision. If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review. 42 U.S.C. § 405(g). If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

---

[1] By agreement with the SSA, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration. 20 C.F.R. Part 404, Subpart Q (§ 404.1601, *et seq.*). Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal SSA.

**Factual and procedural background**

Mr. Nelson alleged a disability-onset date of June 2, 2007. He had filed previous application for DIB and SSI benefits in June 2007, which were denied by a previous ALJ on June 24, 2010. (Apparently Mr. Nelson did not pursue judicial review of those denials.) Because Mr. Nelson's alleged current onset date is within the time period covered by the previous adjudications, the current ALJ construed Mr. Nelson to be making an implied request to reopen the previous determinations, in addition to making a new claim for benefits. The ALJ denied the request to reopen the SSI decision because it was not filed within the regulatory two-year window and she found no basis for reopening. The request was timely for the DIB decision, but the ALJ found that there no new and material evidence was submitted and no evidence of error or fraud in the processing of the earlier applications. Mr. Nelson does not challenge either ruling. The ALJ found that the relevant period for determining Mr. Nelson's new applications commenced on June 25, 2010, the day after the previous ALJ's denial of his previous applications.

Mr. Nelson's applications were denied on initial and reconsideration administrative reviews. He requested and received a hearing before an ALJ in February 2012, during which he and a vocational expert testified. He was represented by present counsel at the hearing. The ALJ issued her denial decision in March 2012.

At step one, the ALJ found that Mr. Nelson had not engaged in substantial gainful activity since June 25, 2010.

At step two, she found that Mr. Nelson has severe impairments of mild lumbar spondylosis, lumber degenerative disc disease, mild cartilage space loss in left hip, varicose veins, hypertension, tobacco abuse, diabetes mellitus, obesity, mood disorder, seizure disorder, and a pain disorder associated with both psychological factors and a general medical condition. She found that non-severe conditions of gatroesophageal reflux disease, hyperdipidemia, chronic obstructive pulmonary disease, history of substance abuse, and seizure disorder.

At step three, the ALJ found that Mr. Nelson's impairments, severe and non-severe, singly or in combination, neither meet nor equal any of the conditions in the listing of impairments. She examined listings 1.02 (major dysfunction of a joint(s), due to any cause), 1.04 (disorders of the spine), 4.00 (cardiovascular system), 9.00 (endocrine disorders), 11.02 (convulsive epilepsy), 11.03 (non-convulsive epilepsy), and mental listings 12.04, 12.06, 12.07, and 12.09.

For steps four and five, the ALJ determined Mr. Nelson's RFC. She found that he retained the capacity for sedentary work with additional exertional, postural, and environmental limitations. Mentally, she found that he was capable of understanding, remembering, and carrying out simple routine tasks; appropriately interact with co-workers, supervisors, and the general public; identify and avoid normal work-place hazards; and adapting to routine changes in the work place.

The ALJ found that Mr. Nelson's credibility regarding the intensity, persistence, and limiting effects of his symptoms to be poor, in part based on his testimonial demeanor:

> The undersigned was able to observe the claimant while he testified, his demeanor, the way he answered questions and all of the factors that go into assessing a witness' credibility. Considering these factors, the undersigned has found his credibility as a witness to be poor and his demeanor during the hearing consistent with the limitations established in his residual functional capacity.

(R. 38.)

At step four, the ALJ found that Mr. Nelson's RFC prevented the performance of any of his past relevant work. At step five, relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs exist in the national economy that a person with Mr. Nelson's RFC and vocational attributes can perform and that, therefore, he is not disabled.

The Commissioner's Appeals Council denied Mr. Nelson's request to review the ALJ's decision, which rendered the ALJ's decision the one that is reviewed.

## Discussion

Mr. Brock makes one overall argument: the ALJ failed to properly consider the opinions of his treating neurologist, Dr. A. A. Smith. Dr. Smith provided six opinion statements. The first two were in November 2009, before the relevant period commencing in June 2010. (R. 310-12, 352-53.) These two statements were produced after Dr. Smith's first consulting examination performed that same month, (R. 405), evidently

on request of Mr. Nelson's counsel for the purpose of supporting his 2007 applications for disability benefits.[2]  Thus, these statements were made before a treating relationship was formed between Dr. Smith and Mr. Nelson.[3]

Dr. Smith's first three "relevant period" opinion statements were produced in September 2010, the same month that Mr. Nelson filed his current applications for disability benefits.  In the first opinion statement, dated September 29, 2010, (R. 404-06),[4] Dr. Smith concludes:  "In summary Mr. Nelson has a clinical history, clinical examination findings, and objective test abnormalities that would all be consistent with his claim that he is unable to perform any type of work activity including sedentary," (R. 405).

His second relevant-period opinion statement is dated the next day, September 30, 2010, and is in the form of a five-page "Pain Questionnaire," the prefatory instructions of

---

2 The first statement, produced on the day of Dr. Smith's initial examination, is a letter to Mr. Nelson's counsel giving Dr. Smith's opinion following his examination of Mr. Nelson.  (R. 352-53.)  The second statement is a two-and-one-half page transcript of an interview of Dr. Smith by Mr. Nelson's counsel, conducted about sixteen days after the initial examination.  (R. 310-12.)

3 In the second statement, counsel asked Dr. Smith if he "had an opportunity to examine and treat" Mr. Smith.  The doctors answers in the affirmative but his responses do not describe any treatments that he provided in the interim.

4 This statement is in the same interview-transcript form as Dr. Smith's second pre-relevant-period statement described in note 3.  The introduction and first ten background questions and answers of this statement are identical to the earlier November 2009 transcript, except for the new date.  The doctor's opinion regarding Mr. Nelson's condition (answering the tenth question) is the same as his earlier opinion except in certain particulars.  For example, in the new statement, Dr. Smith adds that Mr. Nelson required the use of a cane; he does not relate Mr. Nelson's dysesthesia, numbness, tingling, and decrease in reflexes in his extremities to his diabetes or diabetic neuropathy; he omits Mr. Nelson's obesity; and he specifies sedentary work in addition to his earlier opinion that Mr. Nelson "is unable to perform any type of gainful activity whatsoever."  This new statement adds Dr. Smith's opinion on the length of time that Mr. Nelson's could sit at one time.

which state that "claimant's case will be analyzed under Social Security Ruling 96-7, therefore, I am going to ask you certain questions that satisfy the requirements of Ruling 96-7." (R. 409-13.) Many of Dr. Smith's answers are only references to his next statement, which he refers to as the "RFC form."

The third relevant-period opinion statement is also dated September 30, 2010 and is in the form of a four-page "Medical Assessment of Ability To Do Work Work-related Activities (Physical)," the "RFC form" referred to in the second statement. (R. 416-19.) It consists of the doctor's ratings on various measures of Mr. Nelson's exertional capabilities and functional restrictions.

The fourth relevant-period statement is dated two years later, February 13, 2012, and is, again, in the form of a transcript of a brief interview between Dr. Smith and Mr. Nelson's counsel. (R. 485-87.) Dr. Smith states that he has been treating Mr. Nelson since his first examination in November 2009. When asked what Mr. Nelson's care and treatment have been since they last talked on September 29, 2010, Dr. Smith states that "we have had him continue the Dilantin and we changed it to generic extended release to try to reduce the costs to him and otherwise there has been no change." (R. 486.) Mr. Nelson had been taking Dilantin for seizures since before seeing Dr. Smith. (*Id.*) Counsel asked about Mr. Nelson's seizures:

13.    Q.    He says that he has had petit-mal type seizures and that he says he stares off into space. Did he indicate that to you?

> A.  He did not really describe the nature of the seizures to me in any detail.

Asked if there had been any change in Mr. Nelson's health since Dr. Smith's last statement in September 2010, the doctor answered that there was "[n]o significant change." (*Id.*)  Following up, counsel asked, "He is still the same?"  Dr. Smith answered, "Right".  (*Id.*)  The transcript concludes with the following dialogue:

> 18.  Q.  The consulting examiner said he couldn't elicit reflexes due to his obesity.  Do you think there is some truth to that?
>
> A.  Actually the problem would be more related to his diabetic peripheral neuropathy.
>
> 19.  Q.  How does that affect his ability to work, his peripheral neuropathy?
>
> A.  That also contributes to significant reduction in ability to perform any type of work activity.
>
> 20.  Q.  You did EMG testing in the past?
>
> A.  Yes.
>
> 21.  Q.  What did that indicate?
>
> A.  It indicates that significant problem with [*sic*] diffused radiculopathy.
>
> 22.  Q.  Can you summarize what you think his ability to work is?
>
> A.  Mr. Nelson describes inability to tolerate as little as one hour of sitting, standing, or walking, as little as ten pounds of lifting and carrying, or any bending or twisting.  As a result he would be permanently and totally disabled.
>
> 23.  Q.  And you agree with his opinion about how restricted he is?
>
> A.  I do.

(R. 486-87.)

In her decision, the ALJ noted that Mr. Nelson sees Dr. Smith for his seizures. (R. 35.) She found that his two opinion statements in November 2009, to the effect that Mr. Nelson 's ability to perform basic work activities was severely restricted, were not entitled to great weight because **(1)** they are not supported by the evidence as a whole and **(2)** they were made prior to the relevant period. The ALJ noted the following specifics in Dr. Smith's four later opinion statements, made during the relevant period:

> **Sitting.** Mr. Nelson would have difficulty tolerating sitting, on a single occasion, in excess of two hours total in an eight-hour, even less on the basis of a five-day work week, (Sept. 29 and 30, 2010); he agreed with Mr. Nelson's report that he could not tolerate as little as one hour of sitting at one time, (Feb. 13, 2012).

> **Standing and walking.** Mr. Nelson can stand for one hour and walk for one hour out of an eight-hour work day, (Sept. 30, 2010; Feb. 13, 2013).

> **Lifting, carrying.** Mr. Nelson can occasionally lift/carry up to ten pounds (Sept. 30, 2010); he agreed with Mr. Nelson's report that he in unable to tolerate lifting or carrying as little as ten pound, (Feb. 13, 2012).

> **Bending or twisting.** Dr. Smith agreed with Mr. Nelson's report that he is unable to tolerate any bending or twisting, (Feb. 13, 2012).

> **Precipitating or aggravating factors.** "Any activity" precipitates or aggravates Mr. Nelson's pain, (Sept. 30, 2010).

> **Disability.** Mr. Nelson's clinical history, clinical examination findings, and objective test abnormalities are all consistent with Mr. Nelson's claim that he is unable to perform any type of work activity, including sedentary work, (Sept. 29, 2010); Mr. Nelson's impairments have more than a minimal effect on his physical or mental abilities to do basic work activities, (Sept. 30, 2010); Dr. Smith agreed with Mr. Nelson's descriptions of his sitting, standing, walking, lifting, and carrying limitations, which result in him being permanently and totally disabled, (Feb. 13, 2012).

(R. 40.)

The ALJ first noted that she was not bound by Dr. Smith's opinions regarding the ultimate issue of the degree of Mr. Nelson's disability because disability is a decision reserved to the Commissioner and involves legal, medical, and vocational issues that physicians do not always take into consideration. She did not assign Dr. Smith's assessments "great weight" because **(1)** the overall evidence does not indicate that Mr. Nelson's condition is disabling under the regulations, **(2)** Dr. Smith's opinion is not consistent with the overall record evidence, **(3)** Dr. Smith's extreme limitations appear to be overly sympathetic and based on Mr. Nelson's statements and self-reports, and **(4)** the overall record evidence does not indicate a significant change or increase in the severity of Mr. Nelson's condition since the date of the decision denying his earlier applications for benefits. (R. 40.)

The ALJ assigned the opinions of Dr. Brill, the state-agency medical consultant, "great weight" because he was able to review most of the record evidence. (R. 40-41.) She adopted his opinion of Mr. Nelson's RFC with restrictions and included the limitations found in the previous ALJ's decision. (*Id.*)

Overall, the ALJ found that Mr. Nelson was not credible regarding the severity or functional limitations of his symptoms, (R. 38, 39); she found that he has been treated only conservatively, based on findings which were not interpreted as disabling or severe, (R. 38-9), which is consistent with her defined RFC, (R. 41); and she found that the record

does not show a worsening of Mr. Nelson's condition since the date of the earlier ALJ's finding of no disability, (R. 38).

Mr. Nelson argues three ways in which the ALJ failed to properly weigh Dr. Smith's opinions.

**1.    Failure to discuss Dr. Smith's treating relationship or qualifications.**  Mr. Nelson argues that the ALJ failed to discuss the length, nature, and extent of Dr. Smith's treating relationship with Mr. Nelson, or the fact that Dr. Smith is board-certified in neurology.

20 C.F.R. § 404.1527(c)(2) provides that, when the Social Security Administration does not give a treating medical source's opinion controlling weight, it will consider six factors to determine how much weight to give the opinion:  (1) the length of the treatment relationship and the frequency of examinations, (2) the nature and extent of the treatment relationship, (3) the extent of relevant medical evidence the source presents to support his opinion, (4) the consistency of the opinion with the record as a whole, (5) the extent to which the opinion concerns issues related to the source's area of specialization, and (6) other factors (*e.g.*, the degree to which the source understands the Administration's standards and evidentiary requirements and the extent to which the sources is familiar with other evidence of record).

The ALJ noted that Mr. Nelson has been seeing Dr. Smith for his seizures, (R. 35), and she discussed and demonstrated a thorough knowledge of Dr. Smith's six opinion statements produced from November 4, 2009, when he first examined Mr. Nelson, to his last statement in February 2012, (R. 39-40). All of these statements record that Dr. Smith is a practicing neurologist and three of the statements clearly state that he is board certified in neurology and psychiatry, (R. 310, 404, 485). In the most recent statement, in February 2012, Dr. Smith states that he has been seeing and treating Mr. Nelson from November 2009 to the date of the statement. (R. 486.) The ALJ's decision repeatedly describes Dr. Smith's interpretation of test results and findings and recommended courses of action regarding Mr. Nelson's neurological condition.

The ALJ's decision demonstrates that she was well-aware of and described *albeit* indirectly or circumstantially, the length, nature, and extent of Dr. Smith's treating relationship with Mr. Nelson. While she did not explicitly identify Dr. Smith in her decision as board-certified in neurology, the fact of his specialty was apparent in his opinion statements and records, of which there can be no doubt that the ALJ was well-aware. There can be no reasonable doubt that she considered the fact of his specialty and board certification. Moreover, Mr. Nelson does not suggest how the ALJ's failure to explicitly identify Dr. Smith's certification affected her decision or how a remand for specific articulation might lead to a different conclusion.

**2. Incorrect consistency standard.**  The ALJ wrote that she did not assign great weight to Dr. Smith's opinions, in part, because they are "not consistent with the overall record evidence."  (R. 40.)  Mr. Nelson argues that, according to Social Security Ruling 96-8p, if a treating source's opinion on the nature and severity of a claimant's impairments is well-supported by medical evidence and "is not inconsistent with the other substantial evidence in the case record," then the adjudicator "must give it controlling weight."  See also 20 C.F.R. § 404.1527(c)(2).  Citing *Lopez-Navarro v. Barnhart*, 207 F.Supp.2d 870 (E.D. Wis. 2002), Mr. Nelson argues that the ALJ's "not consistent" with the evidence standard is not the same as the regulation's and Rulings' "not inconsistent with" the evidence standard.

On this point, Mr. Nelson is correct.  However, the context must be clarified to determine the applicable standard.  Mr. Nelson clearly is arguing that the ALJ applied the wrong standard for determining whether Dr. Smith's opinions should be given controlling weight.  If the ALJ was engaged in making that analysis, then it is apparent from her decision that her error was only semantic.  She, in fact, discussed and relied on substantial evidence in the record that was inconsistent with Dr. Smith's opinions.  For example, the ALJ credited and adopted the opinions of Dr. Brill, the state-agency medical consultant, who opined that Mr. Nelson was capable of performing a range of sedentary work, which was directly contrary to Dr. Smith's opinions.  (R. 40.)  She also noted other physicians' opinions on the nature and severity of Mr. Nelson's impairments

that contradicted Dr. Smith's opinions (*e.g.*, Dr. Philip's finding of no symptoms of peripheral neuropathy or diabetic nephropathy, or neurological deficits, (R. 36, 389), and Dr. Kahloon's finding that Mr. Nelson had a normal gait without his cane, was able to perform tandem walking with some difficulty, had a normal sensory examination, and had an otherwise normal neurological examination, (R. 37, 433)).  In addition, the ALJ found that Mr. Nelson's credibility when testifying about his symptoms, his exertional capacities, and their limiting effects was poor, which contradicts Dr. Smith's own crediting of Mr. Nelson's descriptions, which the ALJ found were the basis of his opinions on Mr. Nelson's exertional and work abilities.  (R. 38, 39.)

Mr. Nelson counters with a litany of clinical and laboratory diagnostic findings that he argues shows that the medical evidence is not inconsistent with Dr. Smith's opinions.  However, the opinions that were most relevant to the ALJ's evaluation of the weight to assign to Dr. Smith's opinions were not the medical findings *per se* (she already found that Mr. Nelson had severe impairments and credited many, if not most, of the diagnoses and objective medical findings in the record), but the functional limitations resulting therefrom.  As noted above, Dr. Smith opinions on Mr. Nelson's ability to sit, walk, stand, lift, carry, bend, and twist; precipitating and aggravating factors; and his overall disability from performing any work activity were the crucial opinions expressed by Dr. Smith on the nature and severity of Mr. Nelson's impairments, and Mr. Nelson does not address the ALJ's evaluations and weighing of *those* opinions.  In addition to

17

declaring that she was not bound by Dr. Smith's opinions on the ultimate question of Mr. Smith's disability — because that is an issue reserved to the Commissioner — the ALJ found that Dr. Smith's opinions on these exertional, postural, and disability factors were directly contradicted by other substantial evidence in the record (for example, the opinions of Dr. Brill), appeared to be based on his personal crediting of Mr. Nelson's own statements and self reports, and were contradicted by the poor credibility of Mr. Nelson's own testimony on these matters at the hearing.

To the extent that the ALJ's evaluation of the consistency of Dr. Smith's opinions with the record as a whole was not an evaluation of whether the opinions should be accorded *controlling* weight but an evaluation of what less-than-controlling-weight to accord them, then the regulation expressly provides for the standard that the ALJ articulated: "When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion." 20 C.F.R. § 404.1527(c)(2). The factor listed in paragraph (c)(4) of § 404.1527 is: "*Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."

Mr. Nelson has not shown that the ALJ committed error in her articulation or application of the consistency standard for evaluating opinions of treating sources.

**3. Failure to state the weight accorded Dr. Smith's opinions.** Mr. Nelson argues that, aside from stating that Dr. Smith's opinions "are not assigned great weight," the ALJ failed to state the amount of weight she did assign them. Specifically, he argues that the ALJ failed to review the checklist of factors provided in 20 C.F.R. § 404.1527(c). As explained above, there is no significant doubt that the ALJ knew and considered the length of the treatment relationship, the frequency of examination, the nature of and extent of the treatment relationship, §404.1527(c)(2)(i) and (ii) (first and second factors), and Dr. Smith's neurology specialty, §404.1527(c)(5) (fifth factor). The ALJ also addressed the extent to which Dr. Smith presented medical signs and laboratory findings to support his relevant opinions. §404.1527(c)(3) (third factor). She found that his opinions regarding Mr. Nelson's exertional and postural abilities (sitting, standing, bending, *etc.*) and his disability from work were based on his credibility determination of Mr. Nelson's own statements and self reports. Finally, as discussed above, the ALJ discussed the consistency of Dr. Smith's opinions with the other evidence of record as a whole. § 404.1527(c)(4) (fourth factor).

While the ALJ did not articulate an affirmative degree of weight that she assigned Dr. Smith's opinions — instead, stating it negatively as "not assigned great weight" — it is clear that she did assign "great weight" to, and adopted, the opinions of Dr. Brill on the subjects on which Dr. Smith opined, and that she found that Mr. Smith had poor credibility when testifying about the severity of his symptoms and the degree of his

resulting functional limitations, which Dr. Smith stated he fully credited. (Mr. Nelson did not challenge the ALJ's credibility determination.) If the ALJ's comparatively-stated weights were improper and ineffective, then Mr. Nelson did not articulate an alternative scale of weight descriptions that would have satisfied the § 404.1527(c).

Mr. Nelson has not shown that the ALJ erred in evaluating or articulating the weight that she assigned to the opinions of Dr. Smith.

### Conclusion

This magistrate judge **RECOMMENDS** that the Commissioner's decision denying Mr. Brock's applications for disability benefits be **AFFIRMED.**

### Notice regarding objections

Within fourteen days after being served with a copy of this recommendation, either party may serve and file specific written objections thereto. 28 U.S.C. ▪ 636(b); Fed. R. Civ. P. 72(b)(2). A district judge shall make a *de novo* determination of those portions of the recommendation to which objections are made. 28 U.S.C. ▪ 636(b); Fed. R. Civ. P. 72(b)(3). Failure to file an objection might result in forfeiture of the right to de novo determination by a district judge and to review by the court of appeals of any portion of the recommendation to which an objection was not filed. *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011); *United States v. Pineda-Buenaventura*, 622 F.3d 761, 777 (7th Cir. 2010); *Schur v. L. A. Weight Loss Centers, Inc.*, 577 F.3d 752, 761 n. 7 (7th Cir. 2009); *Kruger*

*v. Apfel*, 214 F.3d 784, 787 (7th Cir. 2000); *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

 **DONE this date:**  08/07/2014

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.